Charles Talbert
No. 810247
CFCF
7901 State Road
Phila. Pa. 19136                    September 22, 2019

United States District Court
Eastern District of Pennsylvania
Charles Talbert                     Civil Action
      vs.
Dr. Schneider                       No. 18-5112-MAK
Dr. Patel
D. Shellenberger
A. Horne
Dr. Taylor
Dr. Fowler
Dr. Lisco
Dr. Reynolds                        Final Amended Complaint

I. Parties

1. Plaintiff, from September 2018 through September 2019, was a pretrial detainee within the Philadelphia Department of Prisons. (PDP)

2. Dr. Schneider and Dr. Patel, are licensed dentists that are contracted by the PDP to provide inmates dental services.

3. D. Shellenberger, is a licensed physician assistant that is contracted by the PDP to provide inmates medical services.

4. A. Horne, is a licensed registered nurse that is contracted by the PDP to provide inmates medical services.

5. Dr. Taylor, Dr. Fowler, Dr. Lisco, and Dr. Reynolds, are all licensed psychiatrist, contracted by the PDP to provide mental health services to inmates.

6. Defendants are sued individually and in their official capacity for acts and omissions from September 2018 to September 2019 that violated State and Federal Laws.

II. State And Federal Laws

7. The laws in which Defendants individually violated are:

    (A) Prison Policies.
    (B) Health Care Facilities Act.
    (C) Pennsylvania Administrative Code.
    (D) The Dental Law.
    (E) Mental Health Procedures Act.
    (F) First Amendment - Retaliation.
    (G) Fourteenth Amendment:
        (i) due process.
        (ii) equal protection.
    (H) Title VII of the Civil Rights Act of 1964.

## III. Statement of Claims - Dental

8. Between September 2018 and September 2019, Schneider and Patel had a contractual duty, under state and federal regulations, to provide Plaintiff, and others similarly situated, with emergency, preventive, and therapeutic services in accordance with state and federal laws.

9. In between September 2018 and September 2019, Plaintiff had several complications with his oral condition such as: (A) broken teeth that needed repairs; (B) cavities that needed fillings; (C) decayed teeth that required anesthetic oral extractions; and (D) excruciating pain in various areas from an implanted infection.

10. Dr. Schneider and Dr. Patel were aware of his aforesaid oral complications through various sick call request forms, and unproductive trips to their clinic.

11. Through these unproductive visits, sick call requests, and prior lawsuits, Schneider and Patel were also aware of Plaintiffs' phobia of needles being in his mouth while awake.

12. This phobia, however, was not considered in the commencement and foregoing determination of Plaintiffs' treatment plan, which ultimately caused Plaintiffs' conditions to go untreated.

13. This act and omission by Schneider and Patel shows that both named dental Defendants deviated from the accepted standard of care as follows:
    (A) Failing to treat Plaintiff in a manner in accordance with the standard of dental care prevailing in the dental community.
    (B) Failing to utilize proper diagnostic procedures and

techniques to determine which tooth could be saved and/or needed to be extracted.
(C) Failing to carefully and thoroughly consult with Plaintiff concerning his phobia and alternative care and treatment plans.
(D) Failing to thoroughly evaluate and properly interpret the dental records of Plaintiffs' past dental history.
(E) Failing to consult with the oral surgeon that pulled out 3 teeth while Plaintiff was asleep.

14. As a direct and proximate result of Schneider and Patels deliberate indifference and negligence, Plaintiff was subject to:
(A) an adverse impact on his health, forcing him to endure unnecessary pain and discomfort from an untreated infection and decayed teeth.
(B) suffering from difficulty in eating and chewing, emotional upset, nervousness and anxiety, and a general loss of enjoyment of life.
(C) having to incur financial obligations for future dental care and treatment, that was required to be given by Defendants while under their immediate care.

15. Schneider and Patel additionally deprived Plaintiff any antibiotics or pain medication for a year, with Patel only providing 7 days worth in April of 2019, only when Plaintiff pulled out one of his own teeth himself.

## Count One - Prison Policy

16. Plaintiff incorporates by reference the statements made in paragraphs 1-15 as though set forth herein at length.
17. Prison policy 4.E.5 states: "The services of specialized healthcare providers in the community will be available when an inmates illness has been determined to require those services."
18. Both Schneider and Patel were clearly aware of Plaintiffs' phobia of needles as aforementioned, through an extensive manifold collection of grievances, sick call request, unproductive visits and prior lawsuits.
19. Both Schneider and Patel disregarded this phobia and refused to send Plaintiff offsite to an oral specialist that used anesthesia upon patients afraid of needles.

20. This careless disregard and failure to provide a referral as before, is the direct and proximate cause of the pain and suffering in which Plaintiff endured for a year.

WHEREFORE, Plaintiff demands judgment in his favor against Schneider and Patel in an amount in excess of $500,000.00 compensatory and punitive damages, costs, fees, and interest.

## Count Two - Pa. Admin. Code / Dental Law

21. Plaintiff incorporates by reference the statements made in paragraphs 1-20 as though set forth herein at length.

22. Pa. Admin. Code Section 141.11 "Facilities and Equipment" states: "Facilities and supplies for the dental service shall be such as to foster effective and timely patient care. Equipment, instruments and supplies in the dental service shall be of the same high quality as is required by generally accepted standards of dental practice."

23. As aforesaid, Schneider and Patels lack of anesthesia was centered on the reason why they failed to foster to Plaintiff effective and timely care as required by accepted standards of dental practice.

24. Pursuant to Admin. Code Section 33.211 "Unprofessional Conduct" subsection (a)(3)(4)(5)(7) and (8) and The Dental Law 63 P.S. section 123.1 (a)(8) it states: "it will be deemed to be unprofessional conduct when a dentist: (3) delegates to a person duties that the dentist knows or has reason to know the person is not competent to perform or not authorized to perform; (4) withdraws dental services after a dentist-patient relationship has been established so that the patient is unable to obtain necessary dental care in a timely manner; (5) verbally abusing a patient; (7) failing to follow current infection-control recommendations issued by the Federal Centers for Disease Control; and (8) failing to provide necessary dental care to a patient in a timely manner or to apprise (inform) the patient of the need for the care."

25. As aforesaid, Schneider and Patel made false statements in regards to them being able to treat Plaintiff by anesthesia; had interfered and ceased all offsite dental relationships with specialists he was sent to in 2015; has repeatedly verbally disrespected Plaintiff in dismissive and

bias manner; had failed to control and thereafter remove the infection within his system; and failed to provide the referral for treatment in which they could of provided.

WHEREFORE, Plaintiff demands judgment against Schneider and Patel in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, and interest.

### Count Three - First Amendment Retaliation

26. Plaintiff incorporates by reference the statements made in paragraphs 1-25 as though set forth herein at length.
27. As aforesaid, Plaintiff filed and settled a lawsuit against Correctional Dental Associates for depriving and delaying required treatment.
28. In the present complaint, both Schneider and Patel have denied Plaintiff's requests for offsite anesthetic oral surgery in retaliation of his prior lawsuits and grievances filed against them and their colleagues, which was protected conduct under the First Amendment.
29. Schneider and Patel additionally deprived Plaintiff of pain and infection medication in retaliation of his lawsuits and grievances.

WHEREFORE, Plaintiff demands judgment against Schneider and Patel in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, and interest.

### Count Four - Fourteenth Amendment Due Process And Equal Protection

30. Plaintiff incorporates by reference the statements made in paragraphs 1-29 as though set forth herein at length.
31. As aforesaid, Plaintiff had multiple teeth that either had cavities or needed extractions.
32. Plaintiff also had a crippling fear of needles being in his mouth while awake.
33. All three issues were serious, as they all were diagnosed as requiring treatment.
34. However, that treatment was intentionally and maliciously denied by Schneider and Patel, while Plaintiff was pretrial detained, for the sole purpose of causing Plaintiff unnecessary and wanton infliction of pain.

35. Both Schneider and Patel knew that Plaintiff had several infected teeth that caused him pain, and knew that Plaintiff had a phobia, yet still denied him a referral. WHEREFORE, Plaintiff demands judgment against Schneider and Patel in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, and interest.

## IV. Statement of Claims - Medical

36. Plaintiff was admitted at CFCF on or about January 10, 2019.

37. Dr. Saggeiya and Dr. M. Haque have prescribed Plaintiff Flexeril muscle-relaxants for approximately eight (8) years for a known acute and chronic lower-back injury which left him with two (2) herniated disk.

38. After a thorough examination of Plaintiff's lower-back condition on January 19th, and February 27th, 2019 by Dr. Haque, he determined by employing professional judgment that Plaintiff required prescriptions for Flexeril due to his severe muscle spasms that affected his daily routine.

39. On March 1, 2019, Plaintiff and Shellenberger fell into a verbal altercation about the treatment he required for his elevated white blood cells and cholesterol/triglycerides levels.

40. Ms. Shellenberger, at no time during this altercation, had done any evaluations of Plaintiff's lower-back condition.

41. However, due to Shellenberger wishing to retaliate and punish Plaintiff for verbally disrespecting her, she sought to intentionally and maliciously cause Plaintiff severe muscle spasms, and excruciating pain, by discontinuing Plaintiff's order for Flexeril.

42. This discontinuation was made without consultation with Dr. Haque, the prescriber, which violates normal standard procedure.

43. Shellenberger failed to evaluate Plaintiff's lower back condition before wrongfully discontinuing Plaintiffs' order of Flexeril, without first acquiring consent by the prescribing doctor, and without considering Plaintiff's extensive history of being prescribed Flexeril in making the aforesaid decision to discontinue, which demonstrates

a substantial departure from accepted professional judgment, practice or standard.

44. Plaintiff had a ostomy reversal in 2015, which left him with only his smaller intestine.

45. After the surgery, Plaintiff's bowel movements were all liquid form, and repetitive every other half hour.

46. For this complication, several Corizon employees had prescribed Plaintiff either Loperamide, or Immodium to slow up the bowel movements; which also helped to prevent accidental bowel movements while sleep.

47. However, while Plaintiff was in solitary confinement on units A1pod2 and A1pod3 at CFCF, in retaliation of lawsuits filed against Corizon employees and personal dislike, Horne, for approximately five (5) months, had deprived Plaintiff his order for anti-diarrhea medicine, to intentionally cause Plaintiff uncontrollable and repetitive bowel movements.

48. Horne knew by not providing Plaintiff with his prescribed medication, that Plaintiff's condition would worsen, and cause him to wake up daily in his own feces.

49. By failing to provide Plaintiff medication that was prescribed by medical doctors for his serious digestive condition, demonstrates a substantial departure from accepted professional judgment, practice, and standard.

50. The acts and omissions of Shellenberger, and Horne, shows that both named medical Defendants deviated from the accepted standard of care as follows:

   (A) failing to treat Plaintiff in a manner in accordance with the standard of medical care prevailing in the medical health community.

   (B) failing to refrain from carelessly interfering with established required treatment.

51. As a direct and proximate result of the aforementioned, Plaintiff was subject to:

   (A) an adverse impact on his lower back and digestive conditions.

   (B) suffering from severe muscle spasms and several uncontrollable accidental bowel movements while sleep.

   (C) emotional upset, nervousness and anxiety, and a general loss of enjoyment of life.

Count One - Prison Policy

52. Plaintiff incorporates by reference the statements made in paragraphs 1-51 as though set forth at length.

53. In prison policy 4.E.5 it states: "Medications will be issued as prescribed by health services staff. Medications will be dispensed to inmates (as instructed) by certified practitioners."

54. As aforementioned, both Shellenberger and Horne had a contractual duty, per prison policy, to make sure Plaintiff had received his Flexeril and Imodium as prescribed and as instructed by medical doctors with an extensive and more accurate medical judgment of Plaintiff's conditions.

55. However, both Shellenberger and Horne breach the aforesaid prison policy by carelessly and maliciously depriving and discontinuing prescribed medication.

WHEREFORE, Plaintiff demands judgment against Shellenberger and Horne in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, interest.

## Count Two - Health Care Facilities Act - Administrative Code

56. Plaintiff incorporates by reference the statements made in paragraphs 1-55 as though set forth at length.

57. Pursuant to the Health Care Facilities Act (35 P.S. subsection 448.101 - 448.904) and Pa. Admin. Code Section 101.4 "organized medical staff" is defined as a formal organization of physicians... with the delegated responsibility and authority to maintain proper standards for medical care.

58. As aforesaid, the acts and omissions of Shellenberger and Horne demonstrates that the diagnosis, care, and treatment of Plaintiff's serious medical conditions was void of any organized medical staff, and was therefore denied and discontinued by lack of organized medical staff and poor medical judgment which fell below and deviated from the proper standards of medical care. This is also expressed under Pa. Admin. Section 107.21 where it says: "The medical staff shall be organized to accomplish its required functions."

59. Pursuant to Pa. Admin. Section 422.13 "Physician Assistants" nowhere under its regulations does it give permission for Shellenberger to lawfully discontinue medication without the supervision and personal direction of an approved

physician.

60. Furthermore, only the Board of Medicine, pursuant to section 422.13 subsection (d) of the Medical Practice Act of 1955, shall promulgate regulations which define the supervision and personal direction required by the standards of acceptable medical practice.

61. In Section 422.13 subsection (f), it states that Shellenberger shall not independently prescribe or dispense drugs, and therefore, cannot discontinue them independently.

WHEREFORE, Plaintiff demands judgment against Shellenberger and Horne in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, and interest.

## Count Three - First Amendment Retaliation

62. Plaintiff incorporates by reference the statements made in paragraphs 1-61 as though set forth herein at length.

63. As aforementioned, due to personal dislike, verbal altercations (protected speech), and the filing of grievances and lawsuits, was the motivating facts of:
   (A) Shellenberger discontinuing muscle relaxants that was needed for Plaintiff's serious lower back condition.
   (B) Horne depriving anti-diarrhea medication that was needed for Plaintiff's serious digestive condition.

WHEREFORE, Plaintiff demands judgment against Shellenberger and Horne in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, and interest.

## Count Four - Fourteenth Amendment Due Process - Equal Protection

64. Plaintiff incorporates by reference the statements made in paragraphs 1-63 as though set forth herein at length.

65. As aforementioned Shellenberger and Horne were grossly negligent and deliberate indifferent to Plaintiff's serious back and digestive medical conditions by their acts and omissions aforesaid.

66. Other inmates, similarly situated, with lower-back spasms, and irritable bowel syndrome, were given their Flexeril and Imodium as ordered without any intervention or problems from Shellenberger or Horne.

WHEREFORE, Plaintiff demands judgment against Shellenberger and Herne in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, and interest.

## V. Statement of Claims-Mental Health

67. Between September 2018 and September 2019, Plaintiff had suffered from extreme anxiety and trauma-related fear from being ambushed and shot multiple times in 2011 up close range.

68. Plaintiff never recovered mentally from this traumatic event, which he now suffers from post traumatic stress, insomnia, severe distress, anxiety, depression, flashbacks, nightmares, the inability to concentrate, and staying to himself trying to avoid large crowds.

69. While Plaintiff is not in prison, he is prescribed Xanax to treat the symptoms of anxiety, PTSD, and insomnia.

70. However, Dr. Taylor, Dr. Fowler, Dr. Reynolds, and Dr. Lisca, individually and as a collective assembly, disregarded his prior history of taking Xanax for the aforementioned serious mental health condition, and alternatively tried to give Plaintiff psychiatric medication that either:
    (A) didn't work at all.
    (B) caused conditions to worsen.
    (C) caused Plaintiff to feel disconnected from himself.
    (D) caused Plaintiff a heart injury.

71. On October 1, 2018, Reynolds did a bridge order without Plaintiff's knowledge or consent for an order for Pamelor, and never disclosed information pertaining to its color, shape, or side-effects.

72. Plaintiff, for two whole weeks, unknowingly took the Pamelor mistaking the medication for either a generic pain or antibiotic medication for his infected teeth.

73. On October 11, 2018, Fowler discontinued the prescription for Pamelor because an EKG report showed that the medication was causing injury upon Plaintiff's heart.

74. When Fowler discontinued the Pamelor, on the same day, Plaintiff asked him for the name of the psychiatrist that prescribed it for him, in which Fowler had declined to answer, attempting to cover up Reynolds'

acts and/or omissions as aforesaid.

75. On October 29, 2018, Taylor, at Plaintiff's request, had discontinued also the prescription for Buspirone, as Plaintiff did not feel safe anymore with foreign medications in which psychiatrists were using as scientific experimental research, using inmates as guinea pigs.

76. From September 2018 through September 2019, Plaintiff had on numerous occasions requested to be given Xanax to alleviate his severe episodes caused by prior traumatic events in which he constantly relives.

77. Taylor, Fowler, Reynolds, and Lisco, made fraudulent and negligent representations as to why they wouldn't prescribe Xanax:
    (A) it cost alot
    (B) highly addictive
    (C) controlled substance
    (D) capable of being sold in prison

78. This reason is in clear contradiction to the PDP allowing Suboxone to be prescribed to inmates, which is also costly, highly addictive, an opiod based controlled substance, and is always sold in prison.

79. This practice of allowing Suboxone in the prison for people suffering from opiod abuse has a disparate impact on inmates that suffer other life threatening illnesses from either drug or mental conditions.

80. More white Americans have died from opiod abuse than any other race, especially in the Kensington area of Philadelphia and other areas that are predominately white. This is why Suboxone is allowed in the PDP.

81. When the crack cocaine epidemic began to scatter and plague the black communities of America, causing blacks to die at an alarming rate, when coming to prison, they did not receive any special treatment.

82. Nor do blacks that suffer traumatic events get prescribed Xanax, which is known to alleviate all symptoms of anxiety, insomnia, and PTSD.

83. Due to this disparate treatment and blatant discriminative practice, Taylor, Fowler, Reynolds, and Lisco, intentionally and carelessly denied Plaintiff's request for Xanax, causing Plaintiff to suffer from mental torture on a daily basis for over a year.

84. By Taylor, Fowler, Reynolds, and Lisco failing to consider the disparate treatment as aforesaid; and worse, on the fact that Plaintiff was prescribed Xanax in the community, and therefore deprived Plaintiff treatment, demonstrates a departure from accepted standards of care.

## Count One - Prison Policy

85. Plaintiff incorporates by reference the statements made in paragraphs 1-84 as though set forth herein at length.
86. Under policy 4.E.16.5, it states: "The policy in regards to behavior health evaluations is based on and subject to the Commonwealth of Pennsylvania Mental Health Procedures Act and (all) regulations promulgated thereunder... A psychiatrist, nurse practitioner, or licensed clinical psychologist will be designated by the facility behavior health care provider to (assure) that each inmate receives evaluation and treatment under the Act and that the (responsibilities) to the inmate, as defined by the Act, are discharged appropriately."
87. By Reynolds doing a bridge order causing Plaintiff an injury upon his heart; by Fowler and Taylor trying to cover it up; and by Reynolds, Fowler, Taylor, and Lisco denying Plaintiff Xanax to alleviate his symptoms from PTSD, this demonstrates clear violations of the prison policy.
88. The proximate cause of the aforementioned acts and omissions caused Plaintiff mental torture, insomnia, anxiety, mental anguish, nervousness, and an abnormal heart condition. WHEREFORE, Plaintiff demands judgment against Taylor, Reynolds, Lisco, and Fowler in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, interest.

## Count Two - Pa. Admin. Code - Mental Health Procedures Act

89. Plaintiff incorporates by reference the statements made in paragraphs 1-88 as though set forth herein at length.
90. Pursuant to Title 50 Pa.C.S. Ann. Section 7104, "treatment" is defined as diagnosis, evaluation, therapy, or rehabilitation needed to alleviate pain and distress and to facilitate the recovery of a person from mental illness. "Adequate Treatment" is a course of treatment designed and adminis-

tered to alleviate a persons pain and distress and to maximize the probability of his recovery from mental illness.

91. Taylor, Fowler, Lisco, and Reynolds engaged in a practice of disparate treatment, and depriving Plaintiff required prescriptions of Xanax for his aforesaid PTSD.

92. This act and omission clearly deviates from established law in treating individuals with mental illnesses.

Wherefore, Plaintiff demands judgment against said Defendants in an amount in excess of $500,000.00, compensatory and punitive damages, costs, fees, and interest.

## Count Three - First Amendment Retaliation

93. Plaintiff incorporates by reference paragraphs 1-92 as if fully set forth herein.

94. Plaintiff has filed numerous prison grievances, as well as lawsuits against mental health employees, that were colleagues of named Defendants.

95. In retaliation of the aforesaid protected speech, all named Defendants disregarded Plaintiffs mental illnesses and left him to suffer.

WHEREFORE, Plaintiff demands judgment against Defendants Taylor, Fowler, Reynolds and Lisco in an amount in excess of $500,000.00, costs, fees, and interest.

## Count Four - Fourteenth Amendment Due Process - Equal Protection Title VII of the Civil Rights Act of 1964

96. Plaintiff incorporates by reference the statements in paragraphs 1-95 as though set forth herein.

97. As aforesaid, Plaintiffs anxiety, PTSD, and insomnia were are serious mental issues that named Defendants had continuously failed to treat.

98. Plaintiffs phobia of experimental medications was not considered when being denied Xanax.

99. Other inmates were provided controlled substances that were white, while others were deprived Xanax that were of color.

100. This disparate treatment is clearly discriminative, which also

caused Plaintiff to suffer mentally on a daily basis. WHEREFORE, Plaintiff demands judgment against mental health Defendants in an amount in excess of $500,000.00 compensatory and punitive damages, costs, fees, and interest.

I hereby verify under penalty of perjury that the foregoing is true and correct.

9-22-19

Charles Talbert

C. Talbert
Philadelphia Department of Prisons
Philadelphia, PA 19136
PIN 810247

Honorable Mark Kearney, USDJ
U.S. Courthouse
Market Street
6TH Floor
Philadelphia, PA 19106